77 A.3d 1030

**Lincoln MILLER**

v.

**STATE of Maryland.**

**No. 94, Sept. Term, 2012.**

Court of Appeals of Maryland.

Sept. 25, 2013.

Reconsideration Denied Nov. 21, 2013.

---

24. What, if any, benefits Mr. Dize or his survivors would be entitled to under the LHWCA is not before us.

Flynn M. Owens (Rubin & Owens, P.A., Baltimore, MD), on brief, for Petitioner/Cross–Respondent.

Mary Ann Ince, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD), on brief, for Respondent/Cross–Petitioner.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and BELL *, JJ.

BATTAGLIA, J.

Lincoln Miller, Petitioner, a native of Belize, had lived as a permanent resident in the United States since 1981. On June 1, 1999, Miller pled guilty in the Circuit Court for Prince George's County to possession of cocaine with intent to distribute, in violation of Section 286(f)(1)(ii) of Article 27 of the Maryland Code (1957, 1996 Repl. Vol.) [1] and was sentenced to five years' incarceration. During sentencing, Miller was informed of his right to file an application for leave to appeal his conviction to the Court of Special Appeals, but he did not pursue that path.[2] Miller finished serving his mandatory five-

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in reaching the decision in the case.

1. Section 286 of Article 27 of the Maryland Code (1957, 1996 Repl. Vol.) provided in pertinent part:

> (a) Except as authorized by this subheading, it is unlawful for any person:
> (1) To manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance;
>
> \*　　\*　　\*
>
> (f)(1) If a person violates subsection (a)(1) of this section and the violation involves any of the following controlled dangerous substances, in the amounts indicated, the person is subject to the penalties provided in paragraph (3) of this subsection upon conviction:
>
> \*　　\*　　\*
>
> (ii) 448 grams or more of cocaine or 448 grams or more of any mixture containing a detectable amount of cocaine[.]

2. Rule 8–204(b) at the time of Miller's plea provided in pertinent part:

year sentence and while incarcerated also did not file any petition for post-conviction relief.

United States Department of Immigration and Customs Enforcement (ICE) initiated deportation proceedings against Miller, because of his 1999 conviction, after he traveled to his native country in 2008 and was detained upon reentry into the United States. In order to forestall his being deported, Miller filed a Petition for a Writ of Error Coram Nobis, pursuant to Maryland Rule 15–1202.[3] In that Petition, Miller asserted

---

(b) *Application.* (1) How made; time for filing. An application for leave to appeal to the Court of Special Appeals shall be filed in duplicate with the clerk of the lower court. The application shall be filed within 30 days after entry of the judgment or order from which the appeal is sought, except that an application for leave to appeal with regard to bail pursuant to Code, Courts Article, § 3–707 shall be filed within ten days after entry of the order from which appeal is sought.
(2) Content. The application shall contain a concise statement of the reasons why the judgment should be reversed or modified and shall specify the errors allegedly committed by the lower court.

3. Rule 15–1202 provided at the time of Miller's filing:
(a) **Filing; caption.** An action for a writ of error coram nobis is commenced by the filing of a petition in the court where the conviction took place. The caption of the petition shall state the case number of the criminal action to which the petition relates. If practicable, the petition shall be filed in the criminal action.
(b) **Content.** (1) The petition shall include:
(A) the identity of the petitioner as the person subject to the judgment and sentence;
(B) the place and date of trial, the offense for which the petitioner was convicted, and the sentence imposed;
(C) a statement of all previous proceedings, including appeals, motions for new trial, post conviction petitions, and previous petitions for writ of error coram nobis, and the results of those proceedings;
(D) the facts that would have resulted in the entry of a different judgment and the allegations of error upon which the petition is based;
(E) a statement that the allegations of error have not been waived;
(F) the significant collateral consequences that resulted from the challenged conviction;
(G) the unavailability of appeal, post conviction relief, or other remedies; and
(H) a demand for relief.
(2) The petitioner may include a concise argument with citation to relevant authority.

"that his guilty plea was not entered knowingly and intelligently, due to the failure to advise him on the record of the possible immigration consequences attendant to his plea."

On August 21, 2009, Judge Maureen M. Lamasney of the Circuit Court for Prince George's County conducted a hearing on Miller's Petition, during which she accepted the transcript of his guilty plea proceeding, which had been made an attachment to Miller's Petition and showed Miller was not advised on the record of the possibility of adverse immigration consequences. Miller testified during the hearing that he was not aware nor was he advised of the possibility of deportation by his attorney, even though his attorney was aware that he was not a citizen. Judge Lamasney denied the Petition, ruling that a trial court needed only inform a defendant of the "direct" consequences of a plea, which did not include the possibility of deportation: "[i]t is clear from the record that the plea Court did not inform [Miller] of . . . possible immigration consequences. . . . However, 'consequences of the plea' has been interpreted to mean 'direct' consequences."

Miller appealed to the Court of Special Appeals; while his appeal was pending, the United States Supreme Court decided *Padilla v. Kentucky*, 559 U.S. 356, 360, 130 S.Ct. 1473, 1478, 176 L.Ed.2d 284, 290 (2010), in which the Court held that "constitutionally competent counsel" was required to inform Padilla "that his conviction for drug distribution made him subject to automatic deportation." In so holding, the Court analyzed the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (applying *Strickland* in the context of guilty pleas), by which courts would determine initially wheth-

---

(c) **Attachments.** The petitioner shall attach to the petition all relevant portions of the transcript or explain why the petitioner is unable to do so.

(d) **Service.** The petitioner shall serve a copy of the petition and any attachments on the State's Attorney pursuant to Rule 1–321(a).

(e) **Amendment.** Amendment of the petition shall be freely allowed when justice so permits.

er an attorney's representation fell below an objective standard of reasonableness considering prevailing professional norms and, if so, whether there is a reasonable probability the result of the proceeding would have been different, but for the errors. *Padilla,* 559 U.S. at 365, 130 S.Ct. at 1484, 176 L.Ed.2d at 294. The Court explained that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland* " and that the collateral versus direct distinction was "ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation" due to its "close connection to the criminal process." *Id.* at 366, 130 S.Ct. at 1481–82, 176 L.Ed.2d at 293–94. The Court concluded, therefore, "that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel [and, therefore] *Strickland* applie[d] to Padilla's claim." *Id.* at 366, 130 S.Ct. at 1482, 176 L.Ed.2d at 294. The Court held that constitutionally competent counsel is required to "provide her client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.' " *Id.* at 371, 130 S.Ct. at 1484, 176 L.Ed.2d at 297, quoting *Hill,* 474 U.S. at 62, 106 S.Ct. 366, 88 L.Ed.2d 203 (White, J., concurring in judgment). The Court then remanded the case for consideration of whether Padilla suffered prejudice because of his counsel's deficient performance. *Id.* at 375, 130 S.Ct. at 1487, 176 L.Ed.2d at 299.

In light of the Supreme Court's holding, the Court of Special Appeals considered Miller's claim to be controlled by the determination of whether *Padilla* applied "to invalidate [Miller's] guilty plea entered on June 1, 1999[.]" *Miller v. State,* 196 Md.App. 658, 660, 11 A.3d 340, 341 (2010). In determining that *Padilla* did not retroactively apply, prior to 2010, to vacate Miller's conviction, the intermediate appellate court determined that "*Padilla v. Kentucky* announced new law" inapplicable to Miller's conviction. *Id.* at 679–80, 11 A.3d at 352. In so doing, the court applied the retroactivity test set forth in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103

L.Ed.2d 334 (1989), in which the Supreme Court had determined that a "new rule," defined as a rule that "breaks new ground or imposes a new obligation on the States" or a rule where "the result was not dictated by precedent existing at the time the defendant's conviction became final," would not apply retroactively. *Miller*, 196 Md.App. at 666, 11 A.3d at 344 (emphasis omitted), quoting *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070, 103 L.Ed.2d at 349.

Miller, thereafter, filed a Petition for Writ of Certiorari in this Court presenting the sole question of whether *Padilla*'s holding "that failure to advise a non-citizen client about deportation as a possible consequence of a guilty plea constitutes ineffective representation, [should] be applied retroactively" to cases finalized before *Padilla*. 423 Md. 453, 31 A.3d 921 (2011). This question, however, previously had been queued up in the case of *Denisyuk v. State* in which we already had granted certiorari to answer whether *Padilla* applied to Denisyuk's challenge to his 2006 conviction, which, he averred, should have been vacated because his counsel had been ineffective for having failed to advise him of potential adverse immigration consequences prior to pleading guilty. 415 Md. 38, 997 A.2d 789 (2010). In *Denisyuk v. State*, 422 Md. 462, 466, 473, 30 A.3d 914, 916, 920 (2011), we subsequently determined that *Padilla* should be applied retroactively to Sixth Amendment claims arising after the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, after which deportation for certain crimes became practically inevitable for noncitizens: "[W]e hold that *Padilla* applies to postconviction claims arising from guilty pleas obtained after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–546 (effective April 1, 1997) . . . ."

The retroactivity test relied upon in *Denisyuk* was derived from *State v. Daughtry*, 419 Md. 35, 18 A.3d 60 (2011), which required a determination "of whether a particular judicial decision . . . overrules prior law and declares a new principle of law. If a decision does not . . . the decision applies retroactively in the same manner as most court decisions."

*Id.* at 78, 18 A.3d at 86, quoting *Houghton v. County Com'rs of Kent Co.*, 307 Md. 216, 220, 513 A.2d 291, 293 (1986). We also noted, " 'where a decision has applied settled precedent to new and different factual situations, the decision always applies retroactively[,]' and it is only 'where a new rule . . . constitutes a clear break from the past . . .' that the question of prospective only application arises." *Denisyuk,* 422 Md. at 478, 30 A.3d at 923, quoting *Potts v. State,* 300 Md. 567, 577, 479 A.2d 1335, 1341 (1984), quoting in turn *United States v. Johnson,* 457 U.S. 537, 549, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).

Utilizing this test, we determined *Padilla* did not overrule prior law and declare a new principle of law, but rather applied settled precedent—*Strickland*—to a new and different factual situation, and, therefore, *Padilla* applied retroactively. *Denisyuk,* 422 Md. at 481–82, 30 A.3d at 925, citing *Daughtry,* 419 Md. at 78, 18 A.3d at 86; *Potts,* 300 Md. at 577, 479 A.2d at 1341. In so doing, we noted that a number of courts had previously addressed the retroactivity of *Padilla* and although "the decisions [were] not uniform in holding that *Padilla* applie[d] retroactively, we [were] persuaded that those" cases that held *Padilla* applied retroactively "represent[ed] the better reasoned view," *Denisyuk,* 422 Md. at 479, 30 A.3d at 923–24, but also recognized that "all of these courts used the retroactivity test set forth in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)." *Id.* at 480 n. 8, 30 A.3d at 924 n. 8. We suggested, nevertheless, that were the Supreme Court to determine *Padilla* did not apply retroactively under *Teague,* our opinion regarding retroactivity would remain valid because "Maryland has not adopted *Teague,* nor must it. Thus, even if the Supreme Court ever were to hold that *Padilla* is not retroactive under *Teague,* that holding would have no adverse effect on our analysis here." *Id.* at 480 n. 8, 30 A.3d at 924–25 n. 8, citing *Danforth v. Minnesota,* 552 U.S. 264, 282, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008).

We, then, granted Miller's petition for certiorari, 423 Md. 453, 31 A.3d 921 (2011), and remanded the case to the Court of Special Appeals for reconsideration in light of *Denisyuk.* 423 Md. 474, 32 A.3d 1 (2011). Prior to the Court of Special

Appeals' decision on remand, however, the Supreme Court granted certiorari in *Chaidez v. United States*, 655 F.3d 684 (7th Cir.2011), to consider whether *Padilla* had retroactive effect. 566 U.S. ——, 132 S.Ct. 2101, 182 L.Ed.2d 867. Thereafter, the Court of Special Appeals once again affirmed the denial of Miller's Petition for a Writ of Error Coram Nobis, holding that Miller had raised the issue of the voluntariness of his plea in his Petition but not ineffective assistance of counsel, so that *Padilla* and *Denisyuk* were not applicable to his case:

> [O]ur *Miller v. State*[, 196 Md.App. 658, 11 A.3d 340 (2010) ] deals only with the voluntariness of a guilty plea. *Padilla v. Kentucky*, for its part, does not deal with and has absolutely nothing to say about the voluntariness of a guilty plea. The Court of Appeals's opinion in *Denisyuk v. State* also does not deal with and has absolutely nothing to say about the voluntariness of a guilty plea. Conversely, the retroactive Sixth Amendment relief sanctioned by *Denisyuk* was never requested by Miller.... The petition for coram nobis relief never so much as mentioned the Sixth Amendment, and the subject was not raised at the subsequent hearing. Our opinion in *Miller v. State* was not predicated on the Sixth Amendment in any way.... This is our primary reason for concluding, on reconsideration, that *Denisyuk v. State* neither compels nor persuades us to reach a different result in *Miller v. State*. The two cases deal with totally different subjects.

*Miller v. State*, 207 Md.App. 453, 464–65, 53 A.3d 385, 392 (2012).

In the midst of this whirlwind of judicial activity, we granted certiorari, 429 Md. 528, 56 A.3d 1241 (2012),[4] and prior to

---

**4.** We granted Miller's Petition for Writ of Certiorari, 429 Md. 528, 56 A.3d 1241 (2012), to answer the following questions:

1. By holding that there was no existing precedent as of the date Petitioner's conviction became final (September 1, 1999) that would have compelled or dictated a legal ruling that the failure to advise a criminal defendant about deportation consequences would constitute ineffective assistance of counsel, did the Court of Special

oral argument before us, the Supreme Court decided *Chaidez v. United States*, —— U.S. ——, 133 S.Ct. 1103, 185 L.Ed.2d 149 (2013), in which the Court held that *Padilla* did not apply retroactively under *Teague* because *Padilla* had announced a "new rule" of constitutional criminal procedure. The Court acknowledged that "garden variety" applications of the test in *Strickland* "do not produce new rules" but concluded that *"Padilla* did something more":

> Before deciding if failing to provide [advice regarding the possibility of adverse immigration consequences] "fell below an objective standard of reasonableness," *Padilla* considered a threshold question: Was advice about deportation "categorically removed" from the scope of the Sixth Amendment right to counsel because it involved only a "collateral consequence" of a conviction, rather than a component of the criminal sentence? In other words, prior to asking *how* the *Strickland* test applied ("Did the attorney act unreasonably?"), *Padilla* asked *whether* the *Strickland* test applied ("Should we even evaluate if this attorney acted unreasonably?").... [T]hat preliminary question about *Strickland's* ambit came to the *Padilla* Court unsettled—so that the

Appeals overstep its bounds, by disregarding settled precedent, in the form of *Denisyuk v. State*, where this Court, quite to the contrary, flatly held that the Supreme Court ruling in *Padilla v. Kentucky* applies retroactively to post conviction challenges of guilty pleas entered into after April 1, 1997?

2. Did the Court of Special Appeals err in holding that Petitioner could not in any event avail himself of this Court's holding in *Denisyuk*, because his claim for coram nobis relief was based exclusively on his assertion that his guilty plea was involuntary, and not that his trial counsel was ineffective?

3. Even arguendo if Petitioner did not assert a Sixth Amendment claim in his coram nobis petition, was his guilty plea entered into voluntarily, where he was not advised of certain immigration consequences, that is, placement in deportation proceedings, that would follow as a result of the plea?

We also granted the State's Conditional Cross–Petition to answer the following question:

1. Did the Court of Special Appeals improperly consider Miller's claim regarding the denial of his petition for a writ of coram nobis on remand where Miller had waived the claim on which he sought relief and where Miller's claim was without merit in any event?

Court's answer ("Yes, *Strickland* governs here") required a new rule.

*Chaidez,* —— U.S. at ——, 133 S.Ct. at 1107–08, 185 L.Ed.2d at 156–57. The Court further noted that prior to *Padilla,* ten federal appellate courts and thirty state appellate courts to which the issue was presented determined that the Sixth Amendment did not require defense counsel to inform a client that a guilty plea would have adverse immigration consequences, and "if [holding contrary to this weight of authority] does not count as 'break[ing] new ground' or 'impos[ing] a new obligation,' we are hard pressed to know what would." *Id.* at ——, 133 S.Ct. at 1109–10, 185 L.Ed.2d at 159, quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070, 103 L.Ed.2d at 349.

■ The somewhat circuitous path, thus, brings us to the present dilemma: whether *Padilla* applies to Miller's 1999 plea colloquy and subsequent conviction given that the Supreme Court held *Padilla* would not have retroactive effect. We granted certiorari in this case to answer that question, but the State presents us with the preliminary question of whether we can even consider if Miller is entitled to relief because, by failing to file an application for leave to appeal from his guilty plea, Miller waived the right to file his coram nobis petition. Miller, however, contends that waiver does not bar consideration of his arguments before the trial court and on appeal, because, at the time of his guilty plea in 1999 he could not have anticipated that the Supreme Court would decide *Padilla.*

■ "[T]he waiver standards embodied in the Post Conviction [Procedure] Act" apply to coram nobis proceedings, "[t]herefore, the same body of law concerning waiver and final litigation of an issue, which is applicable under the Maryland Post Conviction Procedure Act ... [is] applicable to a coram nobis proceeding challenging a criminal conviction." *Holmes v. State,* 401 Md. 429, 442, 454–55, 932 A.2d 698, 706, 714 (2007). The issue of waiver in the Post Conviction Procedure Act is governed by Section 7–106(b) of the Criminal Procedure

Article, Maryland Code (2001, 2008 Repl. Vol., 2012 Supp.), which provides:

(b) *Waiver of allegation of error.*—(1)(i) Except as provided in subparagraph (ii) of this paragraph, an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation:

1. before trial;

2. at trial;

3. on direct appeal; whether or not the petitioner took an appeal,

4. in an application for leave to appeal a conviction based on a guilty plea;

5. in a habeas corpus or coram nobis proceeding began by the petitioner;

6. in a prior petition under this subtitle; or

7. in any other proceeding that petitioner began.

(ii) 1. Failure to make an allegation of error shall be excused if special circumstances exist.

2. The petitioner has the burden of proving that special circumstances exist.

(2) When a petitioner could have made an allegation of error at a proceeding set forth in paragraph (1)(i) of this subsection but did not make an allegation of error, there is a rebuttable presumption that the petitioner intelligently and knowingly failed to make the allegation.

(c) *Effect of judicial decision that Constitution imposes new standard.*—(1) this subsection applies after a decision on the merits of an allegation of error or after a proceeding in which an allegation of error may have been waived.

(2) Notwithstanding any other provision of this title, an allegation of error may not be considered to have been finally litigated or waived under this title if a court whose decisions are binding on the lower courts of the State holds that:

(i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a proce-

dural or substantive standard not previously recognized; and

(ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence.

In *Holmes,* 401 Md. at 431, 932 A.2d at 699, we addressed "whether an individual who enters a guilty plea but who does not file an application for leave to appeal challenging the resulting conviction and sentence waives his right to subsequently challenge his conviction and sentence through a petition for a writ of error coram nobis when the individual is not incarcerated on parole or probation." In that case, Holmes pled guilty in 1992 to robbery with a deadly weapon. During his guilty plea colloquy, Holmes had been informed of his right to file an application for leave to appeal to the Court of Special Appeals but did not do so. Twelve years later, Holmes was convicted of various drug charges and weapons offenses in the United States District Court for the District of Maryland and was classified as a "career offender" under the Federal Sentencing Guidelines, in part because of his 1992 conviction. In order to avoid being so classified, Holmes thereafter filed a coram nobis petition, seeking to vacate his 1992 guilty plea, alleging his plea was involuntary. We held that his failure to file an application for leave to appeal after being advised of that right during the guilty plea proceedings raised a "rebuttable presumption ... that he waived his right to challenge his conviction through a coram nobis proceeding" *id.* at 475, 932 A.2d at 725, which could only be rebutted if Holmes could demonstrate "special circumstances" to excuse waiver, which he had not done. *Id.* at 473–75, 932 A.2d at 724–25.

Miller does not allege "special circumstances," but argues, rather, that he did not waive his ability to argue that his plea was involuntary and his attorney was ineffective, because he could not have foreseen in 1999 that the Supreme Court would have decided *Padilla* in 2010. The Court of Special Appeals agreed with this argument, noting that "[d]uring the 30–day window in which to apply for leave to appeal, between June 1, 1999 and July 1, 1999, [Miller], of course, had no reason to

anticipate the *Padilla v. Kentucky* decision that was eleven years in the future." *Miller*, 196 Md.App. at 683, 11 A.3d at 354. We disagree because, although *Padilla* was not omnipresent in 1999, at the time of his conviction Miller could have raised the implications of his having not been informed of the adverse immigration consequences of his plea by the trial court and his attorney.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–546 (IIRIRA), effective date April 1, 1997. Prior to 1990, non-citizens convicted of certain crimes could avoid deportation if the sentencing judge made a judicial recommendation against deportation (JRAD), and until IIRIRA, the Attorney General of the United States could exercise his or her discretion to halt deportation. As the Supreme Court in *Padilla* noted, after IIRIRA, deportation became practically inevitable for non-citizens convicted of certain crimes, including those for which Miller was convicted:

[T]he JRAD procedure is no longer part of our law. Congress first circumscribed the JRAD provision in the 1952 Immigration and Nationality Act (INA), and in 1990 Congress entirely eliminated it, 104 Stat. 5050. In 1996, Congress also eliminated the Attorney General's authority to grant discretionary relief from deportation, 110 Stat. 3009–596, an authority that had been exercised to prevent the deportation of over 10,000 noncitizens during the 5–year period prior to 1996, *Immigration & Naturalization Service v. St. Cyr*, 533 U.S. 289, 296, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Under contemporary law, if a noncitizen has committed a removable offense after the 1996 effective date of these amendments, his removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted of particular classes of offenses. See 8 U.S.C. § 1229b. Subject to limited exceptions, this discretionary relief is not available for an offense

related to trafficking in a controlled substance. *See* § 1101(a)(43)(B); § 1228.

*Padilla,* 559 U.S. at 363, 130 S.Ct. at 1480, 176 L.Ed.2d at 292.

In 1997, prompted by concerns raised by the Maryland Hispanic Bar Association after enactment of IIRIRA, Chief Judge Robert M. Bell of this Court referred the matter of requiring advisement of immigration consequences during the guilty plea colloquy, which was not required by Rule 4–242 at that time, to this Court's Standing Committee on Rules of Practice. In November of 1998, in its One Hundred Forty–First Report, which was published in the Maryland Register, the Rules Committee proposed the addition of subsection (e) to Rule 4–242, which would require a defendant be informed that a guilty plea could entail adverse immigration consequences prior to the acceptance of that plea:

(e) Collateral Consequences of a Plea of Guilty or Nolo Contendere

Before the court accepts a plea of guilty or nolo contendere, the court, the State's Attorney, the attorney for the defendant, or any combination thereof shall advise the defendant (1) that by entering the plea, the defendant may face additional consequences including but not limited to more severe punishment if the defendant is convicted of another crime in the future, and, if the defendant is not a United States citizen, deportation, detention, or ineligibility for citizenship and (2) that defendant should consult with defense counsel if the defendant need additional information concerning the potential consequences of the plea. The omission of advice concerning the collateral consequences of a plea does not require that the plea be declared invalid.

Maryland Register, Vol. 25, Nov. 20, 1998. On January 20, 1999, this Court, having considered the proposal of the Rules Committee, adopted Rule 4–242(e), which provided:

(e) *Collateral Consequences of a Plea of Guilty or Nolo Contendre* Before the court accepts a plea of guilty or nolo contendre, the court, the State's Attorney, the attorney for the defendant, or any combination thereof shall advise the

defendant (1) that by entering the plea, if the defendant is not a United States citizen, the defendant may face additional consequences of deportation, detention, or ineligibility for citizenship and (2) that the defendant should consult with defense counsel if the defendant is represented and needs additional information concerning the potential consequences of the plea. The omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid.

Rule 4–242(e) [5] became effective on July 1, 1999, after having been subject to public comment during its period of proposal and before this Court.

In 1999, when Miller entered his guilty plea and was sentenced, therefore, the issues of the voluntariness of his plea and effectiveness of counsel based upon the failure to advise of adverse immigration consequences were available to him, so that waiver of his ability to subsequently raise them, absent having filed an application for leave to appeal, would otherwise be an impediment to our considering his claims. We shall, nonetheless, exercise our discretion to address Miller's contentions, because of the unique circumstances of this case: its long and circuitous history; the fact that when we granted Miller's second petition for certiorari, the Supreme Court had taken certiorari to decide in *Chaidez* if *Padilla* had retroactive application; and that before oral argument in the instant case, the Supreme Court in *Chaidez* held that *Padilla* did not apply retroactively. As a result, we will enter the fray in order to resolve an issue which begs for resolution after the Supreme Court's decision in *Chaidez*, which held, contrary to *Denisyuk*, that *Padilla* does not have retroactive effect.[6]

---

**5.** Rule 4–242(e) has been re-lettered to 4–242(f) and in pertinent part has remained the same.

**6.** We have exercised our jurisdiction under Rule 8–131 in many other unique circumstances to address important, novel issues calling for guidance. *See, e.g., Burch v. State,* 346 Md. 253, 289, 696 A.2d 443, 461 (1997).

 After exhausting state avenues for relief, an individual in custody after conviction on a state charge may file a federal habeas corpus petition in federal court pursuant to Section 2254(a) of Title 28 of the United States Code.[7] In order to uphold the principles of federalism and comity between federal and state courts, retroactivity of Supreme Court rulings in federal courts considering a habeas petition is governed by the dictates of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the application of which involves a three-part test for determining whether a rule articulated by the Supreme Court is to have retroactive effect.

"[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, [489 U.S. 288, 109 S.Ct. 1060, at 1070, 103 L.Ed.2d 334 (1989).] In determining whether a state prisoner is entitled to habeas relief, a federal court should apply *Teague* by proceeding in three steps. First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. Second, the court must "[s]urve[y] the legal landscape as it then existed," *Graham v. Collins*, [506 U.S. 461, 468, 113 S.Ct. 892, 898, 122 L.Ed.2d 260, 270 (1993) ], and "determine whether a state court considering [the defendant's] claim at the time of his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution," *Saffle v. Parks*, [494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415, 424 (1990) ]. Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroac-

---

7. Section 2254(a) of Title 28 of the United States Code provides:
 (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

tivity principle. See *Gilmore v. Taylor*, [508 U.S. 333, 345, 113 S.Ct. 2112, 2113, 124 L.Ed.2d 306 (1993) ].

*Caspari v. Bohlen*, 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236, 245–46 (1994). Two exceptions to the non-retroactivity of "new rules," are for "watershed rules of criminal procedure" and for rules placing "conduct beyond the power of the government to proscribe." *Chaidez*, —— U.S. at —— n. 3, 133 S.Ct. at 1107 n. 3, 185 L.Ed.2d at 155 n. 3. *Teague*, therefore, "makes the retroactivity of [Supreme Court] criminal procedure decisions turn on whether they are novel. When [the Court] announce[s] a 'new rule,' a person whose conviction is already final may not benefit from the decision in a habeas or similar proceeding." *Id.* at ——, 133 S.Ct. at 1107, 185 L.Ed.2d at 155. The rule generally prohibiting the retroactivity of novel rules, in turn, " 'validates reasonable good-faith interpretations of existing precedents made by state courts,' and thus effectuates the States' interest in the finality of criminal convictions and fosters comity between federal and state courts." *Gilmore v. Taylor*, 508 U.S. 333, 340, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306, 316–17 (1993), quoting *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 1216, 108 L.Ed.2d 347, 356 (1990).

In *Danforth v. Minnesota*, 552 U.S. 264, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), the Petitioner filed for state post-conviction relief arguing that the videotaped testimony of his six-year-old victim was admitted in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which was decided after his conviction became final. The Minnesota Supreme Court concluded that it was bound to apply *Teague* in determining whether *Crawford* applied retroactively, and that under *Teague*, *Crawford* did not have retroactive effect. Subsequently, in *Whorton v. Bockting*, 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), the Supreme Court likewise concluded pursuant to *Teague* that *Crawford* did not have retroactive effect "mak[ing] clear that the Minnesota court correctly concluded that federal law does not *require* state courts to apply the holding in *Crawford* to cases that were final when that case was decided." *Danforth*, 552 U.S.

at 268, 128 S.Ct. at 1034, 169 L.Ed.2d at 864 (emphasis in original). The Court, nevertheless, considered in *Danforth* "whether *Teague* or any other federal rule of law *prohibit[ed]* " the Minnesota court from applying *Crawford* retroactively. *Id.* at 269, 128 S.Ct. at 1034, 169 L.Ed.2d at 864 (emphasis in original). The Supreme Court traced the history of its own retroactivity jurisprudence leading to *Teague* and concluded that its standards for retroactivity were intended "to apply only to federal courts considering habeas corpus petitions challenging state-court criminal convictions," *id.* at 279, 128 S.Ct. at 1040, 169 L.Ed.2d at 871, therefore, *Teague* "does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague*." *Id.* at 282, 128 S.Ct. at 1042, 169 L.Ed.2d at 872.[8]

As we recognized in *Denisyuk*, 422 Md. at 480 n. 8, 30 A.3d at 925 n. 8, we have never expressly adopted *Teague*, nor do we need to here. Certainly, were we to have adopted *Teague* as our standard, the resolution of this case would be facile and resolute. In the absence of the stewardship of *Teague*, though, retroactivity of *Padilla* really is *not* the issue, because, as a state court reviewing Miller's state criminal conviction, we could provide a state remedy for the violations that Miller asserts were one to have existed at that time. In so doing, however, we cannot create a federal remedy denied by the Supreme Court, but must explore whether there is a basis in state law to provide Miller a remedy, beyond that which would be afforded in federal court.[9] Our analysis is informed

---

8. Interestingly, the Supreme Court noted that "[i]t may ... make more sense to speak in terms of the 'redressability' of violations of new rules, rather than the 'retroactivity' of such rules[,]" *Danforth*, 552 U.S. at 272 n. 5, 128 S.Ct. at 1035 n. 5, 169 L.Ed.2d at 866 n. 5, because "[w]hat [the Court is] actually determining when [it] assess[es] the 'retroactivity' of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought." *Id.* at 271, 128 S.Ct. at 1035, 169 L.Ed.2d at 865–66.

9. Were we to independently assert that *Padilla* was retroactive contrary to the Supreme Court in *Chaidez*, federal constitutional law prior to

by two cases decided by the United States Supreme Court, *Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) and *Davis v. United States*, 564 U.S. ——, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011).

In *Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), the Arizona Supreme Court upheld exclusion of evidence seized incident to an arrest pursuant to an arrest warrant that had been quashed seventeen days earlier, unbeknownst to the police officer conducting the search. The warrant remained active because of a clerical error in the court clerk's office, and the state trial court concluded suppression of the evidence was appropriate regardless of whether the police or the clerk's office was responsible for the clerical error. The United States Supreme Court reversed and held that the good-faith exception to the exclusionary rule applied, even though Evans, the Respondent, had argued that the Court lacked jurisdiction "because the Arizona Supreme Court never passed upon the Fourth Amendment issue and instead based its decision on the Arizona good-faith statute . . . an adequate and independent state ground," *id.* at 6–7, 115 S.Ct. at 1189, 131 L.Ed.2d at 41, or, in the alternative, the Court should remand the case to the state court for clarification of the grounds on which its decision rested. *Id.* at 7, 115 S.Ct. at 1189, 131 L.Ed.2d at 41.

The Court exercised jurisdiction, because the Arizona Supreme Court's holding rested on federal constitutional grounds over which the United States Supreme Court is hegemonic. In reversing the exclusion of the evidence based upon the good-faith exception, the Court explained that although state courts could provide greater protection under their own con-

---

2010 would have two distinctly different applications in Maryland. Essentially, a non-citizen who had not been advised of adverse immigration consequences during a plea colloquy could seek redress in a state court for a violation of the United States Constitution, but could not do so in the United States District Court for the District of Maryland on an identical basis. That cannot be the answer when the United States Supreme Court is the final arbiter of federal law.

stitutional provisions, they could not contradict the Supreme Court's interpretation of the United States Constitution:

> We believe that *Michigan v. Long* [, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) ] properly serves its purpose and should not be disturbed. Under it, state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution. They also are free to serve as experimental laboratories, in the sense that Justice Brandeis used that term in his dissenting opinion in *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (urging that the Court not impose federal constitutional restraints on the efforts of a State to "serve as a laboratory"). Under our decision today, the State of Arizona remains free to seek whatever solutions it chooses to problems of law enforcement posed by the advent of computerization. Indeed, it is freer to do so because it is disabused of its erroneous view of what the United States Constitution requires.
>
> State courts, in appropriate cases, are not merely free to—they are bound to—interpret the United States Constitution. In doing so, they are *not* free from the final authority of this Court. This principle was enunciated in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821). . . . In *Minnesota v. National Tea Co.*, 309 U.S. 551, 60 S.Ct. 676, 84 L.Ed. 920 (1940), we recognized that our authority as final arbiter of the United States Constitution could be eroded by a lack of clarity in state-court decisions.

*Id.* at 8–9, 115 S.Ct. at 1190, 131 L.Ed.2d at 42–43 (emphasis in original).

In *Davis v. United States*, 564 U.S. ——, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), the Court addressed retroactivity as a jurisprudential principle and iterated that "[r]etroactive application does not ... determine what 'appropriate remedy' (if any) the defendant should obtain." *Id.* at ——, 131 S.Ct. at 2431, 180 L.Ed.2d at 298, citing *Powell v. Nevada*, 511 U.S. 79, 84, 114 S.Ct. 1280, 1283, 128 L.Ed.2d 1 (1994). Rather, "[r]emedy is a separate, analytically distinct issue." *Id.*, citing

*American Trucking Assn's, Inc. v. Smith,* 496 U.S. 167, 189, 110 S.Ct. 2323, 2336, 110 L.Ed.2d 148 (1990) (plurality opinion).

We glean from *Evans* and *Davis* the premise that the Supreme Court's interpretation of the Sixth Amendment in *Chaidez* binds us with respect to whether that federal constitutional framework lends succor to Miller when the Supreme Court would deny relief. We also derive that application of retroactivity principles in the absence of an express adoption of *Teague* does not answer the issue of whether there is a remedy or redress at all. Miller's allegations of violations, then, can only be redressed were we to find independent state bases for so doing, which we do not.

We need only to review the recent case of *Grandison v. State,* 425 Md. 34, 38 A.3d 352 (2012), to illustrate these principles. After being sentenced to death for his role in two murders in 1983, Grandison, in 2006, filed a motion to reopen a closed post-conviction proceeding in which he argued three pieces of evidence were admitted in violation of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) which, he argued, "should be applied retroactively to cover the happenings at his own trial." *Grandison,* 425 Md. at 63, 38 A.3d at 369; an argument denied at the hearing before the post-conviction court. Before this Court, Grandison acknowledged that the United States Supreme Court in *Whorton v. Bockting,* 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) had held that *Crawford* did not apply retroactively in federal post conviction proceedings but argued that, "Maryland should exercise its power, recognized in *Danforth,* to retroactively apply the rule stated in *Crawford,* under Article 21 of the Maryland Declaration of Rights[.]" *Id.* at 64, 38 A.3d at 370. We refused, noting that the Sixth Amendment and Article 21 of the Maryland Declaration of Rights,[10] had

---

**10.** The Sixth Amendment of the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall

been construed *in pari materia* both before and after *Crawford* and we saw "no reason to modify these precedents or depart from the Supreme Court's ruling in *Whorton* that *Crawford* is procedural and need not be applied retroactively." *Id.* at 64–65, 38 A.3d at 370. In so ruling, we essentially found Article 21 did not provide an independent state constitutional basis for Grandison's argument to prohibit the introduction of evidence admitted after his conviction became final.

The issue before us in the instant case, thus, becomes whether Miller's claims of involuntariness or ineffective assistance of counsel resulting from his failure to be advised of the adverse immigration consequences of his plea had independent state bases in Maryland in 1999. When queried on this point at oral argument, Miller's counsel could not identify any such state bases for affording Miller relief, because there are none.

We had consistently recognized ineffective assistance of counsel claims prior to 1999 as governed by the Sixth Amendment rather than Article 21 and had never "offer[ed] a plain statement that [our] references to federal law were 'being used only for the purposes of guidance, and did not themselves compel the result ... reached.'" *Evans,* 514 U.S. at 10, 115 S.Ct. at 1190–91, 131 L.Ed.2d at 43, quoting *Long,* 463 U.S. at 1041, 103 S.Ct. at 3476, 77 L.Ed.2d at 1214. Prior to 1984 when *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) was decided this Court had never "distinguished between the right to counsel guaranteed by the

have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

Article 21 of the Maryland Declaration of Rights provides:

That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

Sixth Amendment ... and the right provided by Art. 21 of Maryland Declaration of Rights." *Harris v. State,* 303 Md. 685, 695 n. 3, 496 A.2d 1074, 1079 n. 3 (1985), citing *Rutherford v. Rutherford,* 296 Md. 347, 357–358, 464 A.2d 228 (1983); *Utt v. State,* 293 Md. 271, 274–275, 443 A.2d 582 (1982); *Williams v. State,* 292 Md. 201, 217–218, 438 A.2d 1301 (1981); *Thompson v. State,* 284 Md. 113, 122–123, 394 A.2d 1190 (1978). After *Strickland* was decided, moreover, we flatly stated that, "[t]here is no distinction between the right to counsel guaranteed by the Sixth Amendment and Art. 21 of the Maryland Declaration of Rights ...," *State v. Tichnell,* 306 Md. 428, 440, 509 A.2d 1179, 1185 (1986), and had not wavered from that position prior to Miller's guilty plea. *See Perry v. State,* 357 Md. 37, 78, 741 A.2d 1162, 1184 (1999); *Wiggins v. State,* 352 Md. 580, 602–03, 724 A.2d 1, 12 (1999); *Oken v. State,* 343 Md. 256, 283, 681 A.2d 30, 43 (1996); *Gilliam v. State,* 331 Md. 651, 665–66, 629 A.2d 685, 692 (1993); *State v. Thomas,* 325 Md. 160, 170, 599 A.2d 1171, 1175–76 (1992); *Bowers v. State,* 320 Md. 416, 424–25, 578 A.2d 734, 737–38 (1990). We, clearly, then, prior to Miller's guilty plea and conviction in 1999, had not articulated that Article 21 provided an independent state basis for finding counsel deficient based upon a failure to provide advice regarding adverse immigration consequences prior to or during guilty plea proceedings.

By 1999, moreover, even after we adopted Rule 4–242(e), which mandated a trial court inform a defendant of the possibility of adverse immigration consequences, we further articulated that the failure to so advise a defendant did "not itself mandate that the plea be declared invalid." The Rules Commentary acknowledged that the new Rule 4–242(e) did not overrule *Daley v. State,* 61 Md.App. 486, 487 A.2d 320 (1985), in which the Court of Special Appeals held that the failure to advise of adverse immigration consequences did not render a guilty plea involuntary because "possible deportation is merely collateral to his guilty plea," *id.* at 489, 487 A.2d at 322, because it "arises from a separate civil proceeding" and, under immigration law at that time, deportation was not " 'definite' nor 'largely automatic,' " *id.* at 489–90, 487 A.2d at 322.

Miller's claims, in short, are not redressable. As a result, we affirm the denial of Miller's Petition for Coram Nobis Relief and end a four-year long odyssey in Maryland's courts.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

McDONALD, J., concurs.

McDONALD, J., concurring.

I will explain why I join neither of the thoughtful opinions in this case, although it may simply reveal my own ignorance in this arena. I agree with the result reached by the Majority opinion, but do not follow its reasoning—it says it is not applying the *Teague* standard for retroactivity, but is compelled to follow the result in *Chaidez*, which was based on the *Teague* standard. The Dissent points that out and states quite clearly that it believes a different standard set forth in this Court's *Daughtry* case should be applied. But I do not grasp the distinction that the Dissent makes between the *Daughtry* standard and the *Teague* standard in reference to this case, particularly in that the Dissent relies on Justice Sotomayor's dissent in *Chaidez*—a dissent that applied the *Teague* standard.

In the end, I find Justice Kagan's analysis for the *Chaidez* majority persuasive and would apply it here, whether one views it an application of the *Teague* standard or another standard that operates similarly. That brings me to the same place as the Majority.

BARBERA, C.J., GREENE, J., and BELL, C.J., (ret.) dissent.

BARBERA, C.J., dissenting, which GREENE, J., and BELL, C.J. (ret.), join.

Respectfully, I dissent. The issue before the Court essentially boils down to a single question: Does the Supreme Court's decision in *Chaidez v. United States*, —— U.S. ——, 133 S.Ct. 1103, 185 L.Ed.2d 149 (2013), compel this Court to

overrule its decision in *Denisyuk v. State,* 422 Md. 462, 30 A.3d 914 (2011)? The majority concludes (without explicitly stating so) that the answer to this question is yes, while I, for reasons I shall explain, conclude that the answer is no. As this Court decided in *Denisyuk,* I would continue to apply retroactively the decision of the Supreme Court in *Padilla v. Kentucky,* 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), to postconviction claims arising from guilty pleas obtained in Maryland state courts after April 1, 1997.

As a preliminary matter, I note my agreement with the majority on two points. First, I agree with the majority's conclusion that the "unique circumstances" of Petitioner's case, among other factors, counsel in favor of considering his claims, even though Petitioner failed to file timely an application for leave to appeal from his 1999 guilty plea. *See* Maj. Op. at 191–92, 77 A.3d at 1040. Second, I agree with the majority's statement that "we have never expressly adopted *Teague [v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) ], nor do we need to here." [1] Maj. Op. at 194, 77 A.3d at 1042. This statement is central to my conclusion that *Denisyuk* was decided correctly and need not be altered in light of *Chaidez.*

It is from here that I must part ways with my colleagues. The majority concludes that "we cannot create a federal remedy denied by the Supreme Court," Maj. Op. at 194, 77 A.3d at 1042, in part because, were the Court to do so, "federal constitutional law prior to 2010 would have two distinctly different applications in Maryland," depending on whether a case is filed in federal or state court. Maj. Op. at 194–95 n. 9, 77 A.3d at 1042 n. 9. The majority instead looks to whether there is an independent basis in state law to provide Petitioner with relief and concludes that there is not. *See* Maj. Op. at 197–98, 77 A.3d at 1043–44.

I would conclude otherwise. The first point raised by the majority, concerning the differing applications of the law

---

1. Indeed, as the Supreme Court has stated, "the *Teague* decision ... does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague." Danforth v. Minnesota,* 552 U.S. 264, 282, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008).

depending on whether a litigant is in state or federal court, is merely a byproduct of our federal system. As the Supreme Court itself has noted, "the substantive rights provided by the Federal Constitution define only a minimum. State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution." *Mills v. Rogers*, 457 U.S. 291, 300, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). This principle necessarily means that, at times, a state's interpretation of the law will differ from that of the Supreme Court. This does not mean that we do not recognize the supremacy of the Supreme Court in interpreting federal law. But our federal system allows for this Court to recognize more expansive rights in matters of state law, even when that state law is influenced by past federal precedents.

This Court anticipated in *Denisyuk* that Maryland's jurisprudence in this area might in the future diverge from Supreme Court precedent. Even if we could not foresee the result exactly, we anticipated the possibility that the Supreme Court might issue a decision similar to *Chaidez*. Acknowledging this potential, we cited affirmatively the reasoning of our sister courts on the subject and stated the following:

> Thus, even if the Supreme Court ever were to hold that *Padilla* is not retroactive under *Teague*, that holding would have no adverse effect on our analysis here. Indeed, we cite and discuss these cases because we find persuasive, and subscribe to, the analysis these courts gave to the *Padilla* decision.

422 Md. at 480–81 n. 8, 30 A.3d 914.

This leads to the second significant point in the majority's reasoning with which I disagree. The majority presumes that *Denisyuk*'s holding depended entirely on the federal interpretation of *Padilla* and concludes, in the wake of *Chaidez*, that there is no independent state basis to support such a retroactive application. What the majority overlooks is that Denisyuk applied Maryland's retroactivity jurisprudence in concluding that Padilla should be applied retroactively. 422 Md. at 482.

The retroactivity test laid out by this Court in cases, such as *State v. Daughtry*, 419 Md. 35, 78, 18 A.3d 60 (2011) (quoting *Houghton v. County Comm'rs of Kent County*, 307 Md. 216, 220, 513 A.2d 291 (1986)), states that

> the question of whether a particular judicial decision should be applied prospectively or retroactively, depends in the first instance on whether or not the decision overrules prior law and declares a new principle of law. If a decision does not ... no question of a "prospective only" application arises; the decision applies retroactively in the same manner as most court decisions.

I note that, under *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Prior to *Chaidez*, the Supreme Court never held that an application of *Strickland* "resulted in a new rule." —— U.S. ——, 133 S.Ct. 1103, 1114–15 (Sotomayor, J., dissenting). In fact, *"Padilla* is built squarely on the foundation laid out by *Strickland." Id.* at 1115 (Sotomayor, J., dissenting). I believe that the result in *Padilla* "followed naturally from ... changes in immigration law and the accompanying evolution of professional norms." *Id.* at 1116 (Sotomayor, J., dissenting). In *Denisyuk*, we found instructive the *Padilla* court's observation that "professional norms" for the previous 15 years "have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client's plea." *Denisyuk*, 422 Md. at 481 (quoting *Padilla*, 130 S.Ct. at 1485).

Under Maryland's retroactivity jurisprudence, *Padilla* did not overrule "prior law" and declare "a new principle of law." Rather, it was an application of *Strickland* under a different set of facts. Reasonableness under the prevailing professional norms in June 1999, at the time Petitioner entered his plea, would have led a defense attorney to advise a client of potential immigration consequences.[2]

---

**2.** In *Denisyuk v. State,* we applied *Padilla* retroactively to "the time period following the 1996 amendments to federal immigration law that

Additional support for the view that professional norms supported informing defendants of the potential immigration consequences of pleas can be found in the requirements of Maryland Rule 4–242(f) [3] and the discussion that led to its creation. Although this rule was not adopted until after Petitioner's plea in the present case,[4] the minutes of the April 24, 1998, meeting of the Court of Appeals Standing Committee on Rules of Practice and Procedure reveal that attorneys at the time were aware of the severe changes that had occurred in the immigration landscape after 1996. One representative from the Hispanic Bar Association voiced concerns that the rule was "too innocuous" and might not "reflect the magnitude of the problems in light of the 1996 amendments to the immigration law." The language of the rule ultimately did not declare a plea invalid if a defendant was not informed of immigration consequences, but the discussion during the rules committee meeting indicates that attorneys, in 1998, were aware that attorneys and courts *should* be routinely providing

---

made deportation 'practically inevitable' for noncitizens convicted of removable offenses." 422 Md. 462, 468, 30 A.3d 914 (2011) (quoting *Padilla*, 130 S.Ct. at 1480).

3. The rule (previously located at 4–242(e)) states:

**(f) Collateral consequences of a plea of guilty, conditional plea of guilty, or plea of nolo contendere.** Before the court accepts a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere, the court, the State's Attorney, the attorney for the defendant, or any combination thereof shall advise the defendant (1) that by entering the plea, if the defendant is not a United States citizen, the defendant may face additional consequences of deportation, detention, or ineligibility for citizenship, (2) that by entering a plea to the offenses set out in Code, Criminal Procedure Article, § 11–701, the defendant shall have to register with the defendant's supervising authority as defined in Code, Criminal Procedure Article, § 11–701(p), and (3) that the defendant should consult with defense counsel if the defendant is represented and needs additional information concerning the potential consequences of the plea. The omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid.

4. We explicitly did not base our holding in *Denisyuk* on the rule, *see* 422 Md. at 484 n. 9, 30 A.3d 914, but that does not mean that the rule, and the minutes of committee hearings that led to the rule, cannot inform our decision now.

this warning.[5] The language of the rule was modeled, in part, after language proposed by the American Bar Association. These factors support our assertion in *Denisyuk* that providing advice about the immigration consequences of a plea was a part of the professional norms expected of attorneys prior to the *Padilla* decision.

Our reasoning in *Denisyuk* was sound and this Court is not required to depart from it, nor should it. Under Maryland's retroactivity jurisprudence, I would continue to apply the *Padilla* decision to postconviction claims stemming from guilty pleas that were obtained in our state courts after April 1, 1997.

Judge GREENE and Chief Judge BELL (ret.) have authorized me to state that they join in the views expressed in this dissenting opinion.

---

**5.** We summarized this discussion in *Denisyuk* as follows:

> Furthermore, as Petitioner points out, the minutes of the April 24, 1998, meeting of the Court of Appeals Standing Committee on Rules of Practice and Procedure reflect the intention of the drafters of Rule 4–242(c) to permit collateral challenges, based on ineffective assistance of counsel, to a plea that did not include on-the-record advice concerning immigration consequences:
>
> > The Vice Chair expressed her disagreement with the fact that if a judge fails to advise the defendant about the consequences of a guilty plea, no remedy exists, even if that defendant suffers dire consequences. Some other states provide that if the advice is not given, the plea can be invalidated. The Chair pointed out that there are two aspects to this. One is that the defendant can get postconviction relief based on inadequate advice of counsel. The Rule says that the guilty plea cannot be attacked, but does not preclude postconviction relief. U.S. citizens may not ask for their pleas to be set aside because the judge did not give the advice about immigration consequences. If a particular defendant is unfairly prejudiced, that defendant's right to competent defense counsel should cover this situation.
>
> 422 Md. at 484 n. 9, 30 A.3d 914.